UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| ROBERT BROWN and THE ESTATE OF BOBBI KRISTINA BROWN | ) |
| | ) |
| | ) |
| Plaintiffs | ) Action No. |
| | ) 1:17-cv-06824-AT |
| v. | ) REPLY |
| | ) MEMORANDUM OF LAW |
| | ) IN SUPPORT OF |
| TV ONE LLC, SWIRL RECORDING & FILM INC. | ) APPLICATION FOR |
| D/B/A SWIRL FILMS, INC.,TRACEY BAKER- | ) PRELIMINARY INJUNCTION |
| SIMMONS, WANDA SHELLEY and B2 | ) |
| ENTERTAINMENT LLC and  SIMMONS SHELLEY | ) |
| ENTERTAINMENT, LLC. | ) |
| Defendants | ) |

_____)


ROBERT BROWN and
THE ESTATE OF BOBBI KRISTINA BROWN

By Their Attorneys,
Christopher L. Brown
CB 3465
Brown & Rosen LLC
Attorneys At Law
100 State Street, Suite 900
Boston, MA 02109
617-728-9111 (T)
September 29, 2017                    cbrown@borwnrosen.com

## Table of Contents

Table of Contents   2

Table of Cases   3

Table of Statutes   4

INTRODUCTION   5

ARGUMENT

   1. Plaintiffs Request For An Injunction Must Be Granted Because The
Defendants' Are Violating Multiple Rights That Belong To The Plaintiffs
Have A Likelihood Of Success On The Merits And Suffered Irreparable Harm   5

APPLICABLE LAW AND DISCUSSION   5

A. New York Right to Publicity Law Applies To Robert Brown   5

B. The New York Court of Appeals Has Not Ruled That The First Amendment
Applies To Fictionalized "Biographies" Like Defendants' Bobbi Kristina
Brown Story   6

C. The First Amendment Defense Is Not An Absolute Defense to Lanham
Act Claims   12

   1.TV One Has Been Misleading As To The Source Of The Film   12

   2.TV One Has Been Misleading As To Content Of The Film   14

D. Brown's Defamation Claim Is Properly Plead   14

E. Brown Contract with B2 Entertainment LLC Has Been Breached
Mandating The Issuance Of An Injunction   15

F. Plaintiffs' Have Suffered Irreparable Harm   16

G. Plaintiffs Seek Leave To File A Second Amended Complaint To
Add A Copyright Claim Associated With Robert Brown's Book   19

**CONCLUSION**                                                                                    19


**Table of Cases**


Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743 (1963)                        5

Binns v Vitagraph Co. of Am., 210 NY 51 (1913)                                      7

Bret Michaels v. Internet Entertainment Group, Inc., F. Supp. 2d 823,
1998 U.S. Dist. Lexis 10678 (District Court CA April 28, 1998)                     18

Brown v. American Media Inc., 13 CV 1982- JPO (SDNY 1993)                        6

CDI Energy Servs. v. W. River Pumps, Inc., 567 F.3d 398, 403 (8th Cir. 2009)

Cooney v. Osgood Mach., 81 N.Y.2d 66, 595 N.Y.S.2d 919 (1993)                    5

Curtis Publishing Co. v. Butts, 388 U.S. 130 (1967)                                14

Davis v.  Electronic Arts, No. 12-15737 (9th Cir. Court of Appeals,
Decided January 6, 2015)                                                            10

eBay Inc. v. MercExchange,L.L.C., 547 U.S. 388 (2006)                             17

Estate Of Bobbi Kristina Brown v. Nicholas Gordon, Superior Court Fulton
County, File No. 2015 cv 262460                                                     8

Finger v. Omni Publs. Intl., 77 NY2d 138  (1990)                                   6

Furia v Furia, 116 AD2d 694, 695 (2d Dep't 1986)                                  15

Hart v. Electronic Arts, Inc., 717 F.3d 141 (3d Cir. 2013)                         10

Lerman v Flynt Distrib. Co., Inc., 745 F2d 123 (2d Cir 1984)                       7

Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894  (9th Cir.2002)                    12

Mattel, Inc. v. Walking Mountain, 353 F.3d 792 (9th Cir 2003)                     12

Messenger v Gruner + Jahr Print. & Publ., 94 NY2d 436  (2000),
*cert denied* 531 US 818 (2000)                                                     6,7

New Kids on the Block v. News America Publishing, Inc.,
971 F.2d 302 (9th Cir. 1992)                                      12

New York Times v. Sullivan, 376 U.S. 254 (1964)                  14

Noise in Attic Prods., Inc. v London Records, 10 AD3d 303 (1st Dep't 2004)    15

Porco v. Lifetime, 147 A.D. 3d 1253 (3rd Dept. App. Div 2017)    6,7

Pretty Girl, Inc. v. Pretty Girl Fashions, Inc., 778 F. Supp. 2d 261 (2nd Cir. 2011)    17

Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989)                  10,12

Spahn v Julian Messner, Inc., 18 NY2d 324 (1966), vacated
387 US 239 (1967), adhered to on remand and rearg 21 NY2d 124
(1967), appeal dismissed 393 US 1046 (1969)                      7

TallyHo, Inc. v. Coast Community College District, 889 F.2d at 1029 (11th Cir. 1989)    17

Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7 (2008)        17

**Table of Statutes**

Lanham Act                                                       generally

N.Y. Civ. Rights Law § 50                                        10

N.Y. Civ. Rights Law § 51                                        6,10

## INTRODUCTION

Plaintiffs Robert Brown ("RB") and the Estate of Bobbi Kristina Brown ("BKB") file this Reply Memorandum In Support of Its Application For An Injunction. Plaintiffs seek to have the Defendants' movie, the "Bobbi Kristina Story" enjoined from being released on TV One LLC ("TV One") and its affiliates on October 8, 2017. The movie violates multiple rights of the Plaintiffs. Defendant TV One claims that the film's affirmative defense (First Amendment-freedom speech)  carries the day, however, the defense has no merit because TV One has refused to provide the script or copy of the movie for viewing to access its content.  In addition, Brown's breach of the contract is unopposed and warrants the issuance of an injunction. The Plaintiffs are able to establish irreparable harm in regards to all of their causes of actions therefore, this court must issue an injunction.

## ARGUMENT

### 1. Plaintiffs Request For An Injunction Must Be Granted Because The Defendants' Are Violating Multiple Rights That Belong To The Plaintiffs  Have A Likelihood Of Success On The Merits And Suffered Irreparable Harm

## APPLICABLE LAW AND DISCUSSION

### A. New York Right to Publicity Law Applies To Robert Brown

New York's choice of law analysis, commonly referred to as an "interest analysis," focuses on determining which jurisdiction, "because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation" Cooney v. Osgood Mach., 81 N.Y.2d 66, 595 N.Y.S.2d 919 (1993), quoting Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743 (1963). In this case, TV One has an office in New York City,

marketed the Bobbi Kristina Story in New York City and has business relationships that will air the movie in New York City in October 2017.   The acts complained of occurred in New York City and Brown has previously availed himself of the laws of the State of New York.  See <u>Brown v. American Media Inc.,</u> 13 CV 1982- JPO (SDNY 1993).  New York State's contacts with  the events and TV One's purposeful contacts with New York law, establishes that New York is the appropriate choice of law.

Furthermore, the NY Civil Rights Statute is triggered as the violations occurred in the state of New York.  The fact that Brown is a resident of California is of no consequence.

## B. The New York Court of Appeals Has Not Ruled That The First Amendment Applies To Fictionalized "Biographies" Like Defendants' Bobbi Kristina Brown Story

As indicated in <u>Porco v. Lifetime</u>, 147 A.D. 3d 1253 (3rd Dept. App. Div 2017), decided on February 23, 2017 (Exhibit A), Civil Rights Law § 51 allows a plaintiff to "maintain an equitable action in the supreme court of this state against the [firm or corporation] so using his [or her] name, portrait, picture or voice, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use" (Civil Rights Law § 51). The Legislature intended for this statutory protection of privacy to be "strictly limited to nonconsensual commercial appropriations of the name, portrait or picture of a living person" (<u>Finger v. Omni Publs. Intl.,</u> 77 NY2d 138, 141 [1990]), and these statutory provisions "do not apply to reports of newsworthy events or matters of public interest" (<u>Messenger v Gruner + Jahr Print. & Publ.,</u> 94 NY2d 436, 441 (2000), *cert denied* 531 US 818 (2000).

In <u>Porco</u>, it was discovered that Lifetime intended to broadcast a film entitled "Romeo Killer: The Christopher  Porco Story".  Porco was previously convicted on the murder of his

father.  Porco argued that his rights under Civil Rights Law § 51 were violated and Lifetime needed to establish a newsworthiness exception. The scope of the newsworthiness exception to liability, must be construed in accordance with binding New York Court of Appeals precedent. The Court of Appeals has held that statutory liability applies to a materially and "substantially fictitious biography" Spahn v Julian Messner, Inc., 18 NY2d 324, 329 (1966), *vacated* 387 US 239 (1967), *adhered to on remand and rearg* 21 NY2d 124 (1967), *appeal dismissed* 393 US 1046 (1969)- where a "knowing fictionalization" amounts to an "all-pervasive" use of imaginary incidents Spahn v Julian Messner, Inc., 21 NY2d 124, 127-129 (1967), *appeal dismissed* 393 US 1046 (1969) and a biography that is "nothing more than [an] attempted to trade on the persona" of the plaintiff Messenger v Gruner + Jahr Print. & Publ., 94 NY2d at 446; *see generally* Lerman v Flynt Distrib. Co., Inc., 745 F2d 123, 131-132 [2d Cir 1984]). When it most recently addressed the aforementioned principles, the Court of Appeals explained that a work "may be so infected with fiction, dramatization or embellishment that it cannot be said to fulfill the purpose of the newsworthiness exception" Messenger v Gruner + Jahr Print. & Publ., 94 NY2d at 446. As further binding Court of Appeals precedent makes clear, the fact that a film revolves around a "true occurrence" (*Id.* at 445), such as a rescue of passengers from a shipwreck, does not invoke the newsworthiness exception in the event that the entire account remains "mainly a product of the imagination" Binns v Vitagraph Co. of Am., 210 NY 51, 56 [1913]. ***Finally, the Court of Appeals has directly passed on the issue of whether extending liability in the aforementioned manner violated constitutional protections of freedom of speech and has found no such violation*** S*ee* Spahn v Julian Messner, Inc., 21 NY2d at 129;  Porco, 147, A.D. 3d  at 1255. For this reason, TV One cannot rely on the First Amendment as an affirmative defense to the right to publicity claims presented by the Plaintiffs

In this litigation, the materials as articulated on www.breakdownexpress.com are false, exaggerated, fictional and so dramatized that is does not fulfill the purpose of the newsworthiness exception.  Even if the Defendants' film does contain true occurrences, the BKB film must be a product of the Defendants' imagination designed to trade on the persona of the BKB and RB. The storyline being promoted by TV One is that the film is a true biography of Bobbi Kristina Brown .  The storyline on www.breakdownexpress.com states as follows:

STORY LINE: This is the true story of BOBBI KRISTINA "KRISSI" BROWN, the daughter of WHITNEY HOUSTON and BOBBY BROWN, whose devastation after her  beloved mother's death causes her to follow a tragically similar trajectory..

There is no "tragically similar trajectory" between BKB and Whitney Houston ("WH"). Nicholas Gordon has been found responsible for the wrongful death of BKB and owes the Plaintiffs' in excess of Thirty Million Dollars ($30,000,000.00).  See Estate Of Bobbi Kristina Brown v. Nicholas Gordon, Superior Court Fulton County, File No. 2015 cv 262460.   No one has filed a wrongful death action associated with the death of WH.   BKB was murdered at the age of 22.   WH was an international superstar at the age of 22 and had a career that extended over twenty more years in the music and film industry with substantial success. BKB was a young woman still embarking on her life goals and making career choices before her death. If the film is anything like the information the Defendants published on www.breakdownexpress.com, the Defendants are trading on the persona of BKB and RB purely for financial gain and has created a knowingly false biography of the life of BKB, WH and RB's role in her life. The newsworthiness and First Amendment defense do not apply when the infringing intellectual property contains a "severe" degree of falsity and illustrates a pattern solely designed to its

financial gain and not journalism accuracy. *See* <u>Lerman v. Flynt Distributing</u>, 745 F.2d 123, 132-33 (2d Cir. 1984).

The dramatization is clear when you read the comments of D'Angela Proctor ("Proctor") of TV One September 6, 2017:

> The tabloids painted a picture of two superstars who lived a
> tumultuous life, but we often forget that in the process a little
> girl had to grow up in a limelight that she did not choose.
> In its simplest form, Bobbi Kristina is a story about a beautiful
> mother-daughter relationship intertwined with both of their
> desires to be loved; one just happened to be a superstar and
> the other an innocent bystander to her parents' fame,"
> said D'Angela Proctor, TV One Head of Original Programming
> & Production.
>
> See Exhibit B To the Affidavit of Christopher Brown

The dramatization and embellishment of the BKB Story by Proctor is evident by her statements issued to the press in September 2017.

More importantly, TV One admits that it is trading on the name, life and persona of the Plaintiffs in its Bobbi Kristina Story, however, TV One asserts that the film is absolutely protected by the First Amendment.  TV One is mistaken. *See* <u>Porco</u>.   TV One had the opportunity to provide the BKB script, copy of the  BKB film, in its opposition papers but declined.  It is important to note the possibility  that Tracey Baker-Simmons ("Simmons") utilized confidential sealed information she may have obtained from her involvement in the BKB Probate matter in 2015 as reference material in the TV One movie to create an embellished, dramatized film about BKB. See Affidavit of Christopher Brown, dated September 28, 2017. Despite the fact that TV One is trading on the name, persona and likeness of BKB and RB, TV One has declined to prove that the BKB story  is worthy of First Amendment protection or

satisfies the newsworthy exception under New York Law in accordance with the <u>Porco</u> decision

issued in February 2017. "[W]hether an item is newsworthy depends solely on [its] content"

<u>Messenger v Gruner + Jahr Print. & Publ.</u>, 94 NY2d at 442. Due to TV One's failure to attempt

to establish the newsworthy exception, the Plaintiffs are entitled to an injunction pursuant to

Civil Rights Law § 50 and 51.

In a two-part test first articulated by the U.S. Court of Appeals for the Second Circuit in

<u>Rogers v. Grimaldi</u>, (875 F.2d 994 (2d Cir. 1989), the First Amendment can protect Lanham Act

violators from liability as long as certain standards are met. But the <u>Rogers</u> test has not been

adopted by all courts, especially in regards to claims associated with the rights of publicity.

Indeed, recently in <u>Hart v. Electronic Arts, Inc.</u>, 717 F.3d 141 (3d Cir. 2013), the U.S. Court of

Appeals for the Third Circuit rejected the <u>Rogers</u> test in favor of the "transformative use" test.

The Court in <u>Hart</u> found that while the <u>Rogers</u> test might be appropriate in the trademark context,

it was not appropriate for cases involving rights of publicity.  The 9th Circuit has also rejected the

<u>Rogers</u> test in dealing with rights of publicity. <u>Davis v.  Electronic Arts</u>, No. 12-15737 (9th Cir.

Court of Appeals, Decided January 6, 2015)  To quote the 9th Circuit of Appeals:

> We explained that the *Rogers* test "was designed to protect
> consumers from the risk of consumer confusion – the
> hallmark element of a Lanham Act claim." *Id*. at 1280. In
> contrast, the right of publicity "does not primarily seek to
> prevent consumer confusion." *Id*. "Rather, it primarily
> 'protects a form of intellectual property [in one's person] that
> society deems to have some social utility.'" *Id*. (alteration in
> original) (quoting *Comedy III*, 21 P.3d at 804). Thus, the
> *Rogers* test does not apply to the plaintiffs' right-of-publicity
> claims.

<u>Davis v.  Electronic Arts</u>, No. 12-15737, page 12 (9th Cir. Court of Appeals, Decided

January 6, 2015). Exhibit B.

The Third Circuit and the Ninth Circuit's approach is identical to the New York Court of Appeals precedent and the New York Third Department decision in <u>Porco</u> earlier this year. The First Amendment Defense is an affirmative defense, *See Id*.,that must be proven.  In this litigation, TV One has not established that its film is entitled to First Amendment Protection.

Assuming *arguendo*, that California law applied to the publicity rights of RB, the injunction still must enter. There is an obvious tension between the right of publicity, which allows a person to control the commercial use of their name or likeness, and the First Amendment, which guarantees the right of free expression. Courts have developed various tests to balance these competing interests. The governing test in California, which is being adopted by increasing numbers of courts outside the California state courts, was promulgated by the state Supreme Court in <u>Comedy III Prods. v. Gary Saderup Inc.</u>, 25 Cal. 4th 387 (Cal. 2001).[1] The <u>Comedy III</u> Court held that the critical factor in determining whether a defendant's First Amendment rights outweigh a plaintiff's right of publicity is whether the accused work is "transformative"—whether the plaintiff's identity is "one of the 'raw materials' from which an original work is synthesized, or… the very sum and substance of the work in question." The court found that prints of a realistic charcoal sketch of the Three Stooges, however masterfully executed, were not sufficiently transformative to avoid the right of publicity.

---

[1] Same applies under Georgia Right to Publicity law.

## C. The First Amendment Defense Is Not An Absolute Defense to Lanham Act Claims

The Second Circuit's approach from <u>Rogers</u>, which "requires courts to construe the Lanham Act `to apply to artistic works *only* where the public interest in avoiding consumer confusion *outweighs* the public interest in free expression.'" <u>Mattel, Inc. v. Walking Mountain</u>, 353 F.3d 792, 807 (9th Cir 2003)(emphasis in original) (quoting <u>Rogers</u>, 875 F.2d at 999. The specific test contains two prongs. An artistic work's use of a trademark that otherwise would violate the Lanham Act is not actionable "`unless the [use of the mark] has no artistic relevance to the underlying work whatsoever, ***or, if it has some artistic relevance, unless [it] explicitly misleads as to the source or the content of the work***.'" <u>Mattel, Inc. v. MCA Records, Inc.</u>, 296 F.3d 894, 902 (9th Cir.2002) (quoting <u>Rogers</u>, 875 F.2d at 999) (emphasis added).

Due to the fact that the use of the BKB and RB marks have artistic relevance to the BKB film, TV-One must provide evidence that (1) they did not explicitly mislead as to the sources of the film and (2) did not mislead as to the content of the work, in order to assert the affirmative First Amendment Defense.

### 1. TV One Has Been Misleading As To The Source Of The Film

A Defendant has been misleading as to the source if there is a suggestion of endorsement or sponsorship by the Plaintiff. The basic idea is that use of a trademark is sometimes necessary to identify and talk about another party's products and services. *See* <u>New Kids on the Block v. News America Publishing, Inc.</u>, 971 F.2d 302 (9th Cir. 1992). TV One cannot assert the First Amendment affirmative defense in this litigation because TV One is misleading the public.

First, TV One is paying to have the actors in the BKB film travel around the country promoting the film. The actors are providing interviews confirming that BKB's family is aware of the content of the film which is not accurate, See Affidavit of Alicia Brown, which suggests approval or endorsement of the film.  Furthermore, Simmons is providing interviews to reporters across the country, touting the fact that he was a producer on "Being Bobby Brown" and "Houstons-On Our Own" and stating that she has been around Bobbi Kristina since she was 10 years old in a manner which suggest approval and/or endorsement of the film by Estate of BKB and RB.  See Exhibit "B" to Affidavit of Christopher Brown. Simmons told a reporter as follows:

> Executive Producers Tracey Baker Simmons and Wanda Shelley, creators of the docu-series' "Being Bobby Brown" and "The Houstons," developed the underlying story.
>
> "Bobbi Kristina is a passion project for us because we watched Krissy grow up from the time she was 10 years old and until she became an amazing young adult. The world did not have the opportunity to know and love Krissy the way we did," said Baker-Simmons, executive producer, alongside Wanda Shelley in Simmons Shelley Entertainment.

Such statements clearly suggest an endorsement by the Plaintiffs. Furthermore, Simmons statements are untrue. Simmons was rarely around Bobbi Kristina from 2004-2012. To suggest a deeper connection is a willful attempt to suggest a strong relationship with the family that provided Simmons unprecedented access to Bobbi Kristina Brown which is not correct. Compare with Reply Affidavit of Robert Brown dated September 29, 2017. Simmons exaggerated the statement in order to suggest an approval of the film by the Brown family.

## 2. TV One Has Been Misleading As To Content Of The Film

TV One is also misleading the public as to the content of the work and has not provided any information to support the affirmative First Amendment Defense. As seen in the www.breakdownexpress.com the BKB film is clearly an embellished, dramatized story.  The dramatization is further supported by the public comments of Simmons and Proctor, establishing that the film is primarily a work of fiction. See Porco.  Furthermore, it is clear that elements of the film were taken from RB's copyrighted book "Every Little Step-My Story" as a reference use for the Defendants in violation of copyright law.

TV One had an opportunity to supply the film to this Court in-camera or sealed, but declined to do so.  Hence, there are no facts that establish the affirmative defense of First Amendment as it is a content driven analysis which TV One has not provided to this Court.

## D. Brown's Defamation Claim Is Properly Plead

TV One alleges that RB has not plead actual malice. Brown has plead that the film contents, as indicated on  www.breakdownexpress.com   is defamatory and  published with reckless disregard.  See paragraphs 20-24 of the Amended Complaint. Curtis Publishing Co. v. Butts, 388 U.S. 130 (1967) held that public figures who are not public officials may still sue news organizations if they disseminate information about them which is recklessly gathered and unchecked. With "actual malice" -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not.  New York Times v. Sullivan, 376 U.S. 254, 280 (1964). Plaintiffs' contents the defendants actions were reckless in the production of the film, hence the action is properly plead. TV-One published that Brown was violent toward Whitney with Bobbi

Kristina Brown "as an frightened onlooker".  Www.breakdownexpress.com  goes on to indicate

that the BKB story will frame Robert Brown as not being committed to his daughter.  See

paragraph 16, 20-24 to Plaintiffs Amended Complaint. Such statements are false and defamatory

and establish that the defamation claim is properly plead.  These facts not only establish

defamation, they also establish the falsehood, embellishment and dramatization of the BKB

Story.

**E. Brown Contract with B2 Entertainment LLC Has Been Breached Mandating The Issuance Of An Injunction**

Irrespective of any Lanham Act violations or rights of publicity, an injunction is

warranted due to the breach of the contract between RB and B2 Entertainment LLC. The

following elements must be established on a breach of contract claim: (1) a valid and enforceable

contract; (2) the plaintiff's performance of the contract; (3) breach by the defendant; and (4)

damages. See Noise in Attic Prods., Inc. v London Records, 10 AD3d 303, 307 (1st Dep't 2004);

Furia v Furia, 116 AD2d 694, 695 (2d Dep't 1986). Pursuant to the 2004 agreement between B2

and Brownhouse, Brown, Shelley and Simmons agreed not to use any materials associated with

Brown's family friends or employers without his consent in tv or film projects.  The parties have

an enforceable contract, B2/Shelly/Simmons breached the contract, RB performed the contract

and due to the breach of the contract, the Defendants have damaged RB.  Defendant's BKB

movie is partially the product of the breach of the 2004 agreement. The Contract contained a

confidentiality provision and other clauses relevant to this litigation.

2(b) reads in part:

Artist grants to Company the right to use, film, tape and otherwise record events relating to or occurring in Artist's life and portions of Artist's life story including without limitation any relationships with family, friends, employers and the like during and after all phases of production of the Project, so that Company can produce episodes of the Project, and so that Company can distribute, exhibit and/or otherwise use the Project and/or other works, productions and materials based thereon.

Section 6 reads as follows:

6.      Confidentiality:  Except where required by law, both parties shall keep confidential the Project and any ideas, concepts, stories plots, themes or other material related to the Project unless express written consent is provided by the parties.  Neither party shall: circumvent the other's role and anticipated financial compensation in connection with the Project or other unscripted television programs; negotiate a side deal with any third party in the which does not include the other party; or any way attempt to circumvent the spirit and intent of this Agreement.

The defendants are clearly marketing and advertising a "young" BKB around the age of 9-12 in the BKB Story which is the time the RB and B2/Simmons were shooting "Being Bobby Brown."   The defendants are clearly using material that is the subject of the contract. B2/Simmons and the related entities unauthorized use of materials that are the subject of the contract is impermissible.  This breach has caused irreparable harm to RB and an injunction must enter.

## F. Plaintiffs Have Suffered Irreparable Harm

A party seeking a preliminary injunction also must establish that the party faces a threat of irreparable harm. A possibility of irreparable harm in the absence of an injunction is not sufficient; rather, a plaintiff seeking a preliminary injunction must "demonstrate that irreparable

injury is *likely* in the absence of an injunction." <u>Winter v. Nat. Res. Def. Council, Inc.,</u> 555 U.S.

7, 22 (2008). An alleged harm that can be remedied through damages is not irreparable. *See* <u>CDI</u>

<u>Energy Servs. v. W. River Pumps, Inc.,</u> 567 F.3d 398, 403 (8th Cir. 2009).

Defendants' use of Plaintiffs' trademark without authorization,-when Plaintiffs are not

involved in the production, promotion of the Bobbi Kristina film-risks damaging Plaintiffs'

reputation. *See* <u>Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC</u>, 829 F.

Supp. 2d 836, 845-46 (D. Minn. 2011) (enjoining former franchisee from continued use of

franchisor's trademarks after termination of franchise agreement to prevent damage to brand

reputation and goodwill). This reasoning supports  an injunction prohibiting Defendants from

continuing to use Plaintiffs' trademark to distribute, market and promote the BKB movie.

Irreparable injury will occur to Plaintiffs' business if Defendants are allowed to

willfully infringe upon Plaintiffs' marks. Trademark infringement "by its very nature"

results in irreparable harm to the owner of the mark.   <u>TallyHo, Inc. v. Coast Community</u>

<u>College District</u>, 889 F.2d at 1029 (11th Cir. 1989). Though it is true that this

presumption is weaker after <u>eBay Inc. v. MercExchange,L.L.C.,</u> 547 U.S. 388 (2006), and

the treatment of the presumption varies based on the Circuit.

"Irreparable harm `exists in a trademark  case when the party seeking the

injunction shows that it will lose control over the reputation of its mark pending trial,'

because loss of control over one's reputation is neither `calculable nor precisely

compensable.'" <u>Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.,</u> 778 F. Supp. 2d 261, 269

(2nd Cir. 2011). The Court went on to state: For these same reasons—because the losses

of reputation and goodwill…remedies at law cannot adequately compensate Plaintiff for

its injuries. See generally <u>Nw. Nat'l Ins. Co. of Milwaukee,Wisc. v. Alberts</u>, 937 F.2d 77,

80 (2d Cir. 1991) ("The irreparable injury requisite for the preliminary injunction

overlaps with the absent lack of adequate remedy at law necessary to establish the

equitable rights."). Furthermore, where a defendant provides no assurances that it will

cease its infringing activity, this fact suggests that monetary damages are insufficient.

<u>Montblanc-Simplo GmbH v. Colibri EOne.</u>, 692 F.Supp.2d 245, 259 (E.D.N.Y.2010). In

this action, the defendants have no intention to cease the marketing, advertising and

distribution of the BKB movie.   The irreparable harm is clear and the case law on the

matter is well established.

Plaintiffs' rights to privacy also mandate that an injunction be inured. <u>Bret Michaels v.</u>

<u>Internet Entertainment Group, Inc</u>., F. Supp. 2d 823, 1998 U.S. Dist. Lexis 10678 (District Court

CA April 28, 1998) sex film recording enjoined to protect plaintiff's right to privacy. Plaintiff

had spent years developing his personal persona that the film violated his rights, causing

irreparable injury.

RB is also entitled to an injunction as irreparable will be suffered due to violation of the

Brown/B2 Entertainment LLC contract, specifically the confidentiality clause. The disclosure of

such confidential information cannot be adequately compensated in damages. *See* <u>Hosp. Staffing</u>

<u>Sols., LLC v. Reyes</u>, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) (stating that "the disclosure of

confidential information can constitute an irreparable harm because such information, once

disclosed, loses its confidential nature").  Brown's contract claim is undisputed an unopposed.

The Plaintiffs will suffer irreparable harm due to the Defendants'' violation of the their

rights to publicity (2) Lanham Act violations (3) defamation of Brown (4) breach of contract and

(5) the wrongful use of Brown's copyrighted book as a source of the information which appears in Defendants' movie.  This Court must enjoin the release of the Bobbi Kristina Story.

**G. Plaintiffs Seek Leave To File A Second Amended Complaint To Add A Copyright Claim Associated With Robert Brown's Book**

Upon review of TV-One's Opposition to Plaintiffs' request for an Injunction, Tv-One has argued that it has used portions of Brown's book, "Every Little Step: My Story" and approximately  seven (7) news articles and interviews associated with Brown promoting his book.  See Affidavit of James Rosenfeld generally.   TV One has provided this Court this a copy of Brown's book to support the fact that information in its film appears in his book.  Brown has a copyright in his book, Registration Number-TX0008303343. TV One has no legal right to use the copyright in the creation of its movie about Bobbi Kristina Brown and transform portions of the book into a film. Brown will be seeking leave of the Court to file a copyright infringement claim against the defendants.

**CONCLUSION**

For the reasons, stated above, the Plaintiffs have supported each of the elements necessary for injunctive relief. Accordingly, Plaintiffs request that this Court enter an order restraining and enjoining the Defendants from engaging in or otherwise promoting, marketing, advertising distributing or airing the Bobbi Kristina Story on Tv One.

ROBERT BROWN and
THE ESTATE OF BOBBI KRISTINA BROWN

_____
Christopher L. Brown
CB 3465
Brown & Rosen LLC
Attorneys At Law
100 State Street, Suite 900
Boston, MA 02109
617-728-9111 (T)
cbrown@brownrosen.com

September 29, 2017

# EXHIBIT A

**147** A.D.3d **1253** (2017)
47 N.Y.S.3d 769
2017 NY Slip Op 01421

# CHRISTOPHER PORCO, Appellant,
## v.
# LIFETIME ENTERTAINMENT SERVICES, LLC, Respondent.

### NO. 522707

**Appellate Division of the Supreme Court of New York, Third Department.**

Decided February 23, 2017.

Appeal from an order of the Supreme Court (Muller, J.), entered April 20, 2015 in Clinton County, which granted defendant's motion to dismiss the complaint.

Garry, Lynch, Devine and Mulvey, JJ., concur.

McCarthy, J.P.

Appeal from an order of the Supreme Court (Muller, J.), entered April 20, 2015 in Clinton County, which granted defendant's motion to dismiss the complaint.

[Prior Case History: 48 Misc 3d 419.]

In 2006, plaintiff was convicted of the murder of his father and the attempted murder of his mother (*see generally People v Porco*, 71 **AD3d** 791, 792 [2010], *affd* 17 NY3d 877 [2011]). In December 2012, plaintiff discovered that defendant intended to broadcast a film entitled "Romeo Killer: The Christopher **Porco** Story" (hereinafter the film). On January 29, 2013, plaintiff commenced this action pursuant to Civil Rights Law §§ 50 and 51, seeking a preliminary injunction to prevent the airing of the film. Plaintiff's subsequent motion for a temporary restraining order to prevent the film's broadcast pending a decision on his motion for a preliminary injunction was granted by Supreme Court. Defendant appealed and this Court granted emergency relief to defendant by vacating the temporary restraining order pending an appeal on the merits and, as planned, the film was nationally televised on March 23, 2013. Supreme Court's order was ultimately reversed and vacated by this Court (116 **AD3d** 1264 [2014]). Thereafter, Supreme Court [1254*1254] granted defendant's motion to dismiss the complaint for failure to state a cause of action. Plaintiff now appeals, and we reverse.

On a motion pursuant to CPLR 3211 (a) (7) to dismiss a complaint for failure to state a cause of action, this Court "must afford the complaint a liberal construction, accept as true the allegations contained therein, accord the plaintiff the benefit of every favorable inference and determine only whether the facts alleged fit within any cognizable legal theory" (*He v Realty USA*, 121 **AD3d** 1336, 1339 [2014] [internal quotation marks and citations omitted], *lv dismissed and denied* 25 NY3d 1018 [2015]). New York provides a limited statutory right of privacy. Pursuant to Civil Rights Law § 50, it is a misdemeanor when a firm or corporation

"uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person" (Civil Rights Law § 50). Similarly, Civil Rights Law § 51 allows a plaintiff to "maintain an equitable action in the supreme court of this state against the [firm or corporation] so using his [or her] name, portrait, picture or voice, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use" (Civil Rights Law § 51). The Legislature intended for this statutory protection of privacy to be "strictly limited to nonconsensual commercial appropriations of the name, portrait or picture of a living person" (_Finger v Omni Publs. Intl.,_ 77 NY2d 138, 141 [1990]), and these statutory provisions "do not apply to reports of newsworthy events or matters of public interest" (_Messenger v Gruner + Jahr Print. & Publ.,_ 94 NY2d 436, 441 [2000], _cert denied_ 531 US 818 [2000]).

The scope of the newsworthiness exception to liability, however, must be construed in accordance with binding Court of Appeals precedent. The Court of Appeals has held that statutory liability applies to a materially and "substantially fictitious biography" (_Spahn v Julian Messner, Inc.,_ 18 NY2d 324, 329 [1966], _vacated_ 387 US 239 [1967], _adhered to on remand and rearg_ 21 NY2d 124 [1967], _appeal dismissed_ 393 US 1046 [1969]) where a "knowing fictionalization" amounts to an "all-pervasive" use of imaginary incidents (_Spahn v Julian Messner, Inc.,_ 21 NY2d 124, 127-129 [1967], _appeal dismissed_ 393 US 1046 [1969]) and a biography that is "nothing more than [an] attempt[] to trade on the persona" of the plaintiff (_Messenger v Gruner + Jahr Print. & Publ.,_ 94 NY2d at 446; _see generally_ _Lerman v Flynt Distrib. Co., Inc.,_ 745 F2d 123, 131-132 [2d Cir 1984]). When it most recently addressed the aforementioned principles, the Court of Appeals explained that a work "may be 1255*1255 so infected with fiction, dramatization or embellishment that it cannot be said to fulfill the purpose of the newsworthiness exception" (_Messenger v Gruner + Jahr Print. & Publ.,_ 94 NY2d at 446). As further binding Court of Appeals precedent makes clear, the fact that a film revolves around a "true occurrence" (_id._ at 445), such as a rescue of passengers from a shipwreck, does not invoke the newsworthiness exception in the event that the entire account remains "mainly a product of the imagination" (_Binns v Vitagraph Co. of Am.,_ 210 NY 51, 56 [1913]). Finally, the Court of Appeals has directly passed on the issue of whether extending liability in the aforementioned manner violated constitutional protections of freedom of speech and has found no such violation (_see_ _Spahn v Julian Messner, Inc.,_ 21 NY2d at 129).

Thus, the issue before this Court is whether plaintiff's complaint, when given the benefit of every favorable inference, alleges facts suggesting that defendant knowingly produced a materially and substantially fictitious biography that violates the statutory right of privacy.[1] Turning to the record, plaintiff alleges that the film is a "knowing and substantially fictionalized account" about plaintiff "and the events that led to his incarceration," and that it appropriates his name without his consent "for purposes of profit." In support of this claim, plaintiff offered a letter written by a producer associated with the film to his mother before the film's release. The producer indicated that she was involved in the production of a documentary intended to accompany the film that the producer "hope[d]... [would] provide the platform for [the mother's] family to state their position in a non-fictional program after the [film] airs." Viewing the producer's correspondence in the light most favorable to plaintiff and according plaintiff the benefit of every favorable inference, it is reasonable to infer that the producer indicated that the film was considered to be a fictitious program. Considering the foregoing and the standard of review on a motion to dismiss, we cannot say that plaintiff

has failed 1256*1256 to sufficiently allege the same degree of fictionalization or the same degree of defendant's knowledge of such fictionalization as that which has been found to violate the statutory right to privacy without running afoul of constitutional protections of speech (*see* *Spahn v Julian Messner, Inc.,* 21 NY2d at 129; *see also* *Binns v Vitagraph Co. of Am.,* 210 NY at 56).[2] Accordingly, defendant's motion to dismiss for failure to state a cause of action should have been denied.

Ordered that the order is reversed, on the law, with costs, and motion denied.

[1] The Court of Appeals has made clear that the aforementioned line of cases dealing with "invented biographies of plaintiffs' lives" relate to "strikingly different" scenarios from those cases where the Court has addressed "the unauthorized, and allegedly false and damaging, use of plaintiffs' photographs to illustrate newsworthy articles" (*Messenger v Gruner + Jahr Print. & Publ.,* 94 NY2d at 446). The Court of Appeals has also offered the guidance that courts, in addressing alleged violations of the statutory right of privacy, ought to resort to precedent "directly on point" for the governing rules, which, here, are cases such as *Spahn v Julian Messner, Inc.* (21 NY2d 124 [1967], *supra*) and *Binns v Vitagraph Co. of Am.* (*supra*) that regard biographies (*Messenger v Gruner + Jahr Print. & Publ.,* 94 NY2d at 446).

[2] We emphasize that, at this procedural stage, the film is not before this Court, and "[w]hether an item is newsworthy depends solely on [its] content" (*Messenger v Gruner + Jahr Print. & Publ.,* 94 NY2d at 442 [internal quotation marks and citation omitted]).

# EXHIBIT B

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>

MICHAEL E. DAVIS, AKA Tony
Davis; VINCE FERRAGAMO; BILLY
JOE DUPREE; SAMUEL MICHAEL
KELLER,

<em>Plaintiffs-Appellees</em>,

v.

ELECTRONIC ARTS INC.,
<em>Defendant-Appellant</em>.

</td><td>

No. 12-15737

D.C. No.
3:10-cv-03328-
RS

OPINION

</td></tr>
</table>

Appeal from the United States District Court for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted
September 11, 2014—San Francisco, California

Filed January 6, 2015

Before:  Stephen Reinhardt, Raymond C. Fisher and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Fisher

## SUMMARY[2]

### First Amendment / California Anti-SLAPP Statute

The panel affirmed the district court's denial of Electronic Arts Inc.'s motion to strike a complaint, brought by former professional football players alleging unauthorized use of their likenesses in the video game series *Madden NFL*, as a strategic lawsuit against public participation (SLAPP) under California's anti-SLAPP statute.

The panel rejected Electronic Arts's argument that its use of former players' likenesses was protected under the First Amendment as "incidental use." The panel held that Electronic Arts's use of the former players' likenesses was not incidental because it was central to Electronic Arts's main commercial

---

[2] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

purpose: to create a realistic virtual simulation of football games involving current and former National Football League teams.

The panel held that the district court properly denied Electronic Arts's motion to strike under the anti-SLAPP statute because it had not shown a probability of prevailing on its incidental use defense, and its other defenses (the transformative use defense, the public interest defense, and the test formulated by *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989)) were effectively precluded by the court's prior decision in *Keller v. Elec. Arts (In re NCAA Student-Athlete Name & Likeness Licensing Litig.)*, 724 F.3d 1268 (9th Cir. 2013).

## COUNSEL

Alonzo Wickers IV (argued), Kelli L. Sager, Karen Henry, Kathleen Cullinan and Brendan Charney, Davis Wright Tremaine LLP, Los Angeles, California; Robert Van Nest, R. James Slaughter and Adam Lauridsen, Keker & Van Nest LLP, San Francisco, California, for Defendant-Appellant.

Brian D. Henri (argued), Henri Law Group, Palo Alto, California, for Plaintiffs-Appellees.

Duncan W. Crabtree-Ireland and Danielle S. Van Lier, Screen Actors Guild-American Federation of Television and Radio Artists, Los Angeles, California, for Amicus Curiae Screen Actors Guild-American Federation of Television and Radio Artists.

---

## OPINION

FISHER, Circuit Judge:

We are called upon to balance the right of publicity of former professional football players against Electronic Arts' (EA) First Amendment right to use their likenesses in its *Madden NFL* series of video games. We previously held EA's unauthorized use of a former college football player's likeness in *NCAA Football* series of video games was not, as a matter of law, protected by the First Amendment. *See Keller v. Elec. Arts* (*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*), 724 F.3d 1268 (9th Cir. 2013). In *Keller*, we rejected several of the First Amendment defenses EA raises here on materially indistinguishable grounds. EA advances one additional argument in this appeal – its use of former players' likenesses is protected under the First Amendment as "incidental use." We disagree. We hold EA's use of the former players' likenesses is not incidental, because it is central to EA's main commercial purpose – to create a realistic virtual simulation of football games involving current and former NFL teams.

### I.  Background

EA is a developer and publisher of video games, including *Madden NFL*, which EA publishes annually. *Madden NFL* allows users to play virtual football games between National Football League (NFL) teams by controlling virtual players, or avatars. EA's graphic artists and programmers create the avatars, as well as virtual stadiums, coaches, referees, fans and other audio and visual elements that allow users to

experience a realistic simulation of an NFL game.  Users control the movements of the avatars and the outcome of the game through the users' inputs to the game system.

Each annual version of *Madden NFL* includes all current players for all 32 NFL teams, along with accurate player names, team logos, colors and uniforms. EA has paid National Football Players Inc. – the licensing arm of the National Football League Players Association – annual licensing fees in the millions of dollars to use current players' likenesses.

From 2001 through 2009, *Madden NFL* also included certain particularly successful or popular "historic teams." EA did not obtain a license to use the likenesses of the former players on these historic teams. Although the players on the historic teams are not identified by name or photograph, each is described by his position, years in the NFL, height, weight, skin tone and relative skill level in different aspects of the sport.[3]  For example, *Madden NFL* includes as a historic team the 1979 Los Angeles Rams that played in that year's Super Bowl. Vince Ferragamo, a plaintiff in this action, was a quarterback on the 1979 Rams.  He is Caucasian and was listed in the 1979 Rams media guide as a 26 year-old, six-foot three-inch, 207-pound third-year NFL player.  *Madden NFL* depicts an avatar who is a quarterback for the 1979 Rams and has identical physical characteristics.  *Madden NFL* also includes the 1984 Los Angeles Rams, for which Ferragamo was again a quarterback.  The 1984 Rams media guide lists Ferragamo as a 30-year-old, six-foot three-inch, 212-pound seventh-year NFL player.  *Madden NFL* depicts an avatar on the 1984 Rams with identical physical characteristics.

The plaintiffs alleged that *Madden NFL* similarly includes, without authorization, accurate likenesses of plaintiffs Michael Davis and Billy Joe Dupree, as well as roughly 6,000 other former NFL players who appear on more than 100 historic teams in various editions of *Madden NFL*. The plaintiffs asserted claims for right of publicity under California Civil Code § 3344 and California common law, conversion, trespass to chattels and unjust enrichment on behalf of themselves and all former NFL players depicted in *Madden NFL*.  EA moved to strike the complaint as a strategic lawsuit against public participation (SLAPP) under California's anti-SLAPP statute, California Code of Civil Procedure § 425.16.  The district court denied the motion.

We have jurisdiction over EA's appeal pursuant to 28 U.S.C. § 1291.  We affirm.

## II.  Standard of Review

We review de novo the denial of a motion to strike under California's anti-SLAPP statute.  *See Keller*, 724 F.3d at 1272 n.3.

## III.  Discussion

### A. Anti-SLAPP motion

California's anti-SLAPP statute is "designed to allow courts 'to promptly expose and dismiss meritless and harassing claims seeking to chill protected expression.'" *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 595 (9th Cir. 2010) (quoting *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 682 (9th Cir. 2005)). Under the statute, "a party may file a motion to strike a cause of action against it if the complaint 'aris[es] from any act of that person in furtherance of the person's right of petition or free speech under

---

[3] For purposes of this appeal, EA concedes the *Madden NFL* series uses the plaintiffs' likenesses.

the United States Constitution or the California Constitution in connection with a public issue.'" *Id.* (alteration in original) (quoting Cal. Civ. Proc. Code § 425.16(b)(1)).  To defeat a motion to strike, a plaintiff must "establish[] that there is a probability that the plaintiff will prevail on the claim."  Cal. Civ. Proc. Code § 425.16(b)(1).

The plaintiffs concede that their suit arises from an act by EA in furtherance of its right of free speech under the First Amendment.  Indeed, "[v]ideo games are entitled to the full protections of the First Amendment, because '[l]ike the protected books, plays, and movies that preceded them, video games communicate ideas – and even social messages.'" *Keller*, 724 F.3d at 1270–71 (quoting *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2733 (2011)).

The district court denied EA's motion, however, concluding that the plaintiffs established a reasonable probability they will prevail on their claims.  "'Reasonable probability' . . . requires only a 'minimum level of legal sufficiency and triability.'"  *Mindys Cosmetics*, 611 F.3d at 598 (quoting *Linder v. Thrifty Oil Co.*, 2 P.3d 27, 33 n.5 (Cal. 2000)).  A plaintiff must "state and substantiate a legally sufficient claim," *id.* at 598–99, based on "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based," Cal. Civ. Proc. Code § 425.16(b)(2).  "'Put another way, the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" *Mindys Cosmetics*, 611 F.3d at 599 (quoting *Wilson v. Parker, Covert & Chidester*, 50 P.3d 733, 739 (Cal. 2002)).  "[T]he required probability that [the plaintiffs] will prevail need not be high."  *Hilton v. Hallmark Cards*, 599 F.3d 894, 908 (9th Cir. 2010).

EA does not challenge the plaintiffs' ability to state or support any substantive element of their claims.  Instead, EA argues it is not reasonably probable the plaintiffs will prevail, because their claims are barred by five affirmative defenses under the First Amendment – the transformative use defense, the public interest defense, the public affairs exemption of California Civil Code § 3344(d), the *Rogers* test and the incidental use defense.  Although the anti-SLAPP statute "places on the plaintiff the burden of substantiating its claims, a defendant that advances an affirmative defense to such claims properly bears the burden of proof on the defense." *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 35 Cal. Rptr. 3d 31, 44 (Ct. App. 2005).  EA has the burden of establishing the transformative use defense as a matter of law.  *See Keller*, 724 F.3d at 1274.  On its other affirmative defenses, EA has the burden of establishing "a probability of prevailing."  *Premier Med. Mgmt. Sys., Inc. v. Cal. Ins. Guarantee Ass'n*, 39 Cal. Rptr. 3d 43, 53 (Ct. App. 2006).  For the reasons set forth below, EA has not shown a probability of prevailing on its incidental use defense, and its other defenses are effectively precluded by our decision in *Keller*.[4]  Because EA has not met its burden as to any of its affirmative defenses, the district court properly denied EA's motion to strike.

## B. Transformative use

EA contends the plaintiffs' claims are barred by the transformative use defense formulated by the California Supreme Court in *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 21 P.3d 797 (Cal. 2001). "The defense is 'a balancing test between the First Amendment and the right of publicity based on

---

[4] EA does not seek to distinguish this case from *Keller*.  Instead, EA states it "raises these arguments here to preserve them for *en banc* review in this Circuit and/or United States Supreme Court review."

whether the work in question adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation.'" *Keller*, 724 F.3d at 1273 (quoting *Comedy III*, 21 P.3d at 799).

In *Keller*, we rejected EA's transformative use defense. We held the use of college athletes' likenesses in the *NCAA Football* video game series was not, as a matter of law, transformative use. *See id.* at 1277–79. We relied primarily on *No Doubt v. Activision Publishing, Inc.*, 122 Cal. Rptr. 3d. 397, 411 (Ct. App. 2011), in which the California Court of Appeal rejected a video game maker's transformative use defense because its video game contained "literal recreations" of members of the band "No Doubt" doing "the same activity by which the band achieved and maintains its fame." In *No Doubt*, the court of appeal held, "that the avatars appear in the context of a videogame that contains many other creative elements[] does not transform the avatars into anything other than exact depictions of No Doubt's members doing exactly what they do as celebrities." *Id.* The court concluded the "graphics and other background content of the game are secondary, and the expressive elements of the game remain manifestly subordinated to the overall goal of creating a conventional portrait of No Doubt so as to commercially exploit its fame." *Id.* (alterations and internal quotation marks omitted).

*Keller* concluded *No Doubt* "offers a persuasive precedent that cannot be materially distinguished from Keller's case." 724 F.3d at 1277. As in *No Doubt*, the *NCAA Football* game "replicated Keller's physical characteristics" and allowed "users [to] manipulate [him] in the performance of the same activity for which [he is] known in real life" in "[t]he context in which the activity occurs." *Id.* at 1276. Consequently, "[g]iven that *NCAA Football* realistically portrays college football players in the context of college football games, the district court was correct in concluding that EA cannot prevail as a matter of law based on the transformative use defense at the anti-SLAPP stage." *Id.* at 1279.

The same is true here. Like *NCAA Football*, *Madden NFL* replicates players' physical characteristics and allows users to manipulate them in the performance of the same activity for which they are known in real life – playing football for an NFL team. Neither the individual players' likenesses nor the graphics and other background content are transformed more in *Madden NFL* than they were in *NCAA Football*. Indeed, EA does not attempt to distinguish *Madden NFL* from *NCAA Football*. Instead, EA contends the court erred in *Keller* by focusing on whether the individual avatars were transformed, rather than whether the work as a whole was transformative. Absent "intervening higher authority," however, we are bound by the factually indistinguishable holding in *Keller*. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc).[5] Thus, EA has not shown that the transformative use defense applies to the plaintiffs' claims.[6]

## C. The public interest defense

EA next contends the plaintiffs' common law right of publicity claim is barred by the public interest defense, and their statutory right of publicity claim is barred by the "public affairs" exemption of

---

[5] Further, the court expressly stated in *Keller* that, like the Third Circuit in *Hart v. Electronic Arts, Inc.*, 717 F.3d 141 (3d Cir. 2013), it "considered the potentially transformative nature of the game as a whole." 724 F.3d at 1278.

[6] Because we are bound by *Keller*, we do not reach EA's argument that *Keller* improperly failed to apply strict constitutional scrutiny to the plaintiffs' right-of-publicity claims.

California Civil Code § 3344(d).  Under the common law public interest defense, "no cause of action will lie for the publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it."  *Hilton*, 599 F.3d at 912 (quoting *Montana v. San Jose Mercury News, Inc.*, 40 Cal. Rptr. 2d 639, 640 (Ct. App. 1995)).  Under the statutory "public affairs" exemption, the right of publicity recognized in California Civil Code § 3344(a) does not apply to the "use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account."  Cal. Civ. Code § 3344(d).

Although California courts typically analyze the statutory and common law defenses separately, both defenses "protect only the act of publishing or reporting."  *Keller*, 724 F.3d at 1282.  In *Keller*, we rejected EA's reliance on these defenses, explaining that, unlike the cases on which EA relied, involving a documentary, a newspaper photograph and a game program, EA was "not publishing or reporting factual data."  *Id.* at 1283.  *See Dora v. Frontline Video, Inc.*, 18 Cal. Rptr. 2d 790, 791–92 (Ct. App. 1993) (holding a documentary on surfing featuring a well-known surfer was "a fair comment on real life events"); *Montana*, 40 Cal. Rptr. 2d at 640–41 (holding posters containing previously published newspaper images portraying Joe Montana's football victories were "a form of public interest presentation to which [First Amendment] protection must be extended"); *Gionfriddo v. Major League Baseball*, 114 Cal. Rptr. 2d 307, 314–15 (Ct. App. 2001) (holding "factual data concerning the players, their performance statistics . . . and video depictions" were a "recitation and discussion of factual data" protected by the First Amendment).  "Put simply, EA's interactive game is not a publication of facts about college football; it is a game, not a reference source."  *Keller*, 724 F.3d at 1283.  It "is a means by which users can play their own virtual football games, not a means for obtaining information about real-world football games."  *Id.*

*Madden NFL* is indistinguishable in this regard from *NCAA Football*.  Like *NCAA Football*, although *Madden NFL* contains some factual data about current and former NFL teams and players, it is "a game, not a reference source" or a "publication of facts" about professional football.  *Id.* Again, in the absence of intervening higher authority, our holding in *Keller* controls.  *See Miller*, 335 F.3d at 899.  Thus, EA has not established a probability of prevailing on either the common law public interest defense or the "public affairs" exemption of California Civil Code § 3344(d).

### D. The *Rogers* test

EA next contends *Madden NFL* is entitled to First Amendment protection under the test formulated by the Second Circuit in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989).  *Rogers* held that a literary title does not violate the Lanham Act "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work."  *Id.* at 999.  In *Keller*, we rejected EA's argument that the *Rogers* test should be extended to right-of-publicity claims.  *See* 724 F.3d at 1279–82.  We explained that the *Rogers* test "was designed to protect consumers from the risk of consumer confusion – the hallmark element of a Lanham Act claim."  *Id.* at 1280.  In contrast, the right of publicity "does not primarily seek to prevent consumer confusion."  *Id.*  "Rather, it primarily 'protects a form of intellectual property [in one's person] that society deems to have some social utility.'"  *Id.* (alteration in original) (quoting *Comedy III*, 21 P.3d at 804).  Thus, the *Rogers* test does not apply to the plaintiffs' right-of-publicity claims.

### E. The incidental use defense

Finally, EA contends the plaintiffs' claims are barred by the incidental use defense.  EA did not assert this defense in the district court.  "We apply a general rule against entertaining arguments on appeal that were not presented or developed before the district court."  *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) (internal quotation marks omitted).  That rule, however, is "discretionary, not jurisdictional."  *Id.*  We have recognized three circumstances in which we have discretion to reach waived issues, including "'when the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed.'"  *Id.* (quoting *Bolker v. Comm'r*, 760 F.2d 1039, 1042 (9th Cir. 1985)).  Under the circumstances of this case, whether EA has established a probability of prevailing on its incidental use defense is a question of law that we can address on the existing record.  We therefore exercise our discretion to address the issue.

The parties agree that the incidental use defense exists under California law.  We therefore assume, for purposes of this opinion, that it does.[7]  The parties also rely on the same cases and treatises to define the scope of the defense.  Under those authorities, "[a] number of factors are relevant," such as "(1) whether the use has a unique quality or value that would result in commercial profit to the defendant; (2) whether the use contributes something of significance; (3) the relationship between the reference to the plaintiff and the purpose and subject of the work; and (4) the duration, prominence or repetition of the name or likeness relative to the rest of the publication."  *Aligo v. Time-Life Books, Inc.*, No. C 94-20707 JW, 1994 WL 715605, at *3 (N.D. Cal. Dec. 19, 1994) (internal citations omitted).  *See also* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 28:7.50 (4th ed. 2014) ("The mere trivial or fleeting use of a person's name or image in an advertisement will not trigger liability when such a usage will have only a de minimis commercial implication.");  *Stayart*, 710 F.3d at 723 ("For use of a person's name for advertising or trade purposes to be actionable . . . there must be a substantial rather than an incidental connection between the use and the defendant's commercial purpose." (internal quotation marks omitted));  *Yeager v. Cingular Wireless, LLC*, 673 F. Supp. 2d 1089, 1100 (E.D. Cal. 2009) ("The rationale underlying this doctrine is that an incidental use has no commercial value.");  *Preston v. Martin Bregman Prods., Inc.*, 765 F. Supp. 116, 119 (S.D.N.Y. 1991) ("Whether a use falls within this exception to liability is determined by the role that the use of the plaintiff's name or likeness plays in the main purpose and subject of the work at issue.").  These factors support the plaintiffs' position here.

Under the first and second factors, the former players' likenesses have unique value and contribute to the commercial value of *Madden NFL*.  EA goes to substantial lengths to incorporate accurate likenesses of current and former players, including paying millions of dollars to license the likenesses of current

---

[7] Although California courts have not yet held that the incidental use defense applies to right-of-publicity claims, the defense is widely recognized.  *See* 1 J. Thomas McCarthy, *Rights of Publicity and Privacy* § 6:31 (2d ed. 2014) (citing "the general rule that an insignificant or fleeting use of plaintiff's identity is not an infringement"); *Stayart v. Google Inc.*, 710 F.3d 719, 723 (7th Cir. 2013) (recognizing the incidental use as a defense to right-of-publicity claims under Wisconsin common law and statute); *Lohan v. Perez*, 924 F. Supp. 2d 447, 455 (E.D.N.Y. 2013) (applying the incidental use defense to a right-of-publicity claim under New York law); *Hill v. Nat'l Collegiate Athletic Ass'n*, 865 P.2d 633, 648 n.6 (Cal. 1994) (en banc) (citing favorably the Restatement Second of Torts for the proposition that "mere incidental use [is] not actionable" as "appropriation of [the] commercial or other value of [a] name or likeness").

players.  EA has acknowledged, "[t]he Madden titles are successful in part because they allow consumers to simulate play involving any of the 32 NFL teams, using real NFL players."

Having acknowledged the likenesses of current NFL players carry substantial commercial value, EA does not offer a persuasive reason to conclude otherwise as to the former players.  EA argues that, because there are several thousand players depicted in *Madden NFL*, any individual player's likeness has only a de minimis commercial value.  There is no basis for such a sweeping statement.  EA includes only a small number of particularly successful or popular historic teams.  EA also advertises the inclusion of those historic teams in its promotional materials.[8]  Indeed, we rejected EA's similar reasoning in *Keller*: "If EA did not think there was value in having an avatar designed to mimic each individual player, it would not go to the lengths it does to achieve realism in this regard.  Having chosen to use the players' likenesses, EA cannot now hide behind the numerosity of its potential offenses or the alleged unimportance of any one individual player."  724 F.3d at 1276 n.7.

Under the third and fourth factors, the former players' likenesses are featured prominently in a manner that is substantially related to the main purpose and subject of *Madden NFL* – to create an accurate virtual simulation of an NFL game.  *See Preston*, 765 F. Supp. at 119; *Ladany v. William Morrow & Co., Inc.*, 465 F. Supp. 870, 881 (S.D.N.Y. 1978).  EA has stated publicly it is dedicated to "creating the most true-to life NFL simulation experience as possible . . . We want to accurately deliver an amazing NFL experience in our game."  Accurate depictions of the players on the field are central to the creation of an accurate virtual simulation of an NFL game.  *Cf. Lohan*, 924 F. Supp. 2d at 455–56 (holding the incidental use defense applied when the plaintiff's name was mentioned once in 104 lines of a song and the mention was "entirely incidental to the theme of the Song").  Therefore, EA has not established a probability of prevailing on its incidental use defense.

## IV.  Conclusion

EA has not shown that its unauthorized use of former players' likenesses in the *Madden NFL* video game series qualifies for First Amendment protection under the transformative use defense, the public interest defense, the *Rogers* test or the incidental use defense.  Accordingly, we affirm the district court's denial of EA's motion to strike.[9]

**AFFIRMED.**

---

[8] For example, the Official Game Guide for the 2006 edition of *Madden NFL* states: "Historic Rosters are back again. They allow you to play 'what if'-type games.  For instance, you can replay the '78 Dallas Cowboys vs the '78 Steelers in Super Bowl XIII.  Just select the teams and away you go back in time to play the game.  The players do not have their actual names, but you can edit them if you want optimum realism."

[9] Because EA may preserve issues for en banc or Supreme Court review, *see Singh v. Gonzalez*, 502 F.3d 1128, 1129 (9th Cir. 2007), its appeal of issues foreclosed by *Keller* was not frivolous, and we deny the plaintiffs' request for costs and attorneys' fees pursuant to California's anti-SLAPP statute and Federal Rule of Appellate Procedure 38.